Case: 1:23-mj-00088
Assigned To : Harvey, G. Michael
Assign. Date : 4/27/2023
Description: Complaint W/ Arrest Warrant

**STATEMENT OF FACTS**

Your affiant, Barry Kays, is a Task Force Officer/Special Agent assigned to the Jacksonville Field Office of the Federal Bureau of Investigations. In my duties as a special agent, I am tasked with investigating criminal activity in and around the Capitol Grounds on January 6, 2021. As a Task Force Officer, I am authorized by law or by Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

The United States Capitol is secured 24 hours a day by United States Capitol Police. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by United States Capitol Police. Only authorized people with appropriate identification were allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building, and United States Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the United States Capitol were locked or otherwise secured. Members of the United States Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the United States Capitol, including by breaking windows and by assaulting members of the United States Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

violations of local and federal law, including scores of individuals inside the United States Capitol building without authority to be there.

Several videos from various sources taken on January 6, 2021, at the United States Capitol, depict an individual identified as Daniel Charles BALL: (1) Entering the Capitol without lawful authority to do so; (2) Stealing a piece of a window shutter from the Senate Connecting Corridor; and (3) assaulting Metropolitan Police and United States Capitol Police officers. BALL's assaults include throwing an explosive device that detonated upon at least 25 officers, forcefully shoving against the officers to make entry into the Capitol, throwing a chair or table leg at the entrance, and aiding another subject by handing the subject a large pole right before that subject threw the pole at the officers. BALL's assaultive conduct occurred at the Lower West Terrace. BALL's remaining crimes occurred inside the Senate Connecting Corridor.

### Identity

Agents with the Federal Bureau of Investigation utilized investigative resources that developed a known photograph of the subject, Daniel Charles BALL, which resulted in trained personnel determining a likely match with BALL's Florida Driver License photograph. Agents then compared BALL's image to the image of the individual captured in the riot footage. It is believed to be a positive match, but agents conducted additional investigative steps to corroborate BALL's identity and his involvement in the Capitol riot. Additional images of BALL, to include arrest/booking photographs, a Department of Corrections photograph (*see* figure 1), and open-source social media photographs were compared to images from January 6, 2021 (*see* figure 2). Your affiant agreed with the comparisons.



*Figure 1*          *Figure 2*

On April 27, 2021, BALL was arrested near his home in Florida by the Citrus County Sheriff's Office for the battery (assaulting) of five civilians and two law enforcement officers unrelated to his actions on January 6, 2021. Following his conviction for two counts of battery on a law enforcement officer, BALL was sentenced to serve five years of probation.

Your affiant met with BALL's State of Florida Probation Officer. Without naming BALL, your affiant showed her 14 printed video still shots of BALL in Washington D.C., and at the United States Capitol, from January 6, 2021. Upon viewing the first still shot the probation officer immediately said, "that's Daniel Ball." BALL was identified in each still shot shown. Your affiant then showed 14 videos of BALL from Washington D.C. and the United States Capitol from January 6, 2021, to her. She identified BALL in all 14 videos, and in a video where BALL speaks, she identified his voice. BALL's probation officer also said BALL still owns the same jacket depicted within the videos from January 6, 2021.

BALL's current probation officer was also BALL's probation officer for his first felony conviction, which was in 2014. She visits his home every other month and he visits her office once a month.

**Senate Connecting Corridor**

At approximately 3:29 p.m., BALL entered the U.S. Capitol through the breached Senate Wing doors (*see figure 3*).



*Figure 3*

After approximately one minute, BALL diverted to an adjacent window south of the door, which had already been broken by another subject. BALL pried a large, linear broken piece of a wooden shutter from that window (*see figure 4*). He maintained possession of it throughout his time within the Capitol.

BALL left approximately one minute later spending a total of approximately two minutes inside the U.S. Capitol.



*Figure 4*

Between 3:37 p.m. and 4:22 p.m., BALL was outside on the Upper West Terrace where he engaged in conversation with a female (*see figure 5*). Your affiant identified and interviewed the female who spoke to BALL at the Upper West Terrace. Upon reviewing a snapshot of the video, she remembered speaking with BALL. She did not know him and did not remember much about their conversation only that he (BALL) retrieved a long, linear piece of wood from his jacket pocket and asked her if she wanted a souvenir and "a piece of history." BALL broke off a piece of the wood and gave it to her. Her description of the wood matches the piece of the window shutter BALL took from the U.S. Capitol. She voluntarily turned over this piece of wood to the FBI.

Your affiant also contacted representatives of the Architect of the Capitol, which estimates the replacement cost of the window shutter to be $759.00.



*Figure 5*

### Lower West Terrace

At approximately 4:46 p.m. EST, BALL moved to the Lower West Terrace and joined the rioters who were attacking officers in the tunnel. BALL was observed on video speaking with the rioters outside the tunnel before ascending the steps to Lower West Terrace tunnel (*see figure 6*).



*Figure 6*

BALL joined the rioters at the tunnel opening and, in a concerted effort, BALL shoved forcefully against the front line of officers (*see figures 7 and 8*).



*Figure 7*



*Figure 8*

BALL and others soon retreated after their attempts to breach the police line.

At approximately 4:47 p.m., BALL moved back into the crowd outside of the Lower West Terrace tunnel. BALL turned his back, hunched over, and looked down at something in front of his torso. Another man standing next to BALL also hunched over and looked down. This behavior is consistent with the lighting of a fuse (*see figure 9*).



*Figure 9*

BALL quickly turned his head twice back to look at the officers in the tunnel (*see figure 10*).



*Figure 10*

With a right-armed, overhanded throw, BALL hurled an ignited device at the officers in the tunnel (*see figures 11 and 12*).



*Figure 11*



*Figure 12*

The device flashed and exploded multiple times on the officers in the tunnel. One of these explosions included a loud boom that caused all the officers and some rioters/protesters in the crowd to flinch in unison. The various explosions enveloped the entire tunnel and were captured by multiple cameras (*see figures 13 through 18*).



*Figure 13*



*Figure 14*



*Figure 15*



*Figure 16*



*Figure 17*



*Figure 18*

After the explosions, BALL faced the officers and extended his left fist up (*see figure 19*).



*Figure 19*

Officers who were in the Lower West Terrace tunnel during BALL's thrown explosive described it as a bomb or a grenade being thrown into the tunnel. Your affiant interviewed Metropolitan Police Department Officers J.S., T.C., F.F., and C.T., all of whom were defending the tunnel on January 6, 2021, during this time. After January 6, 2021, Metropolitan Police Department (MPD) Officer J.S. had hearing impairment lasting months. MPD Officer T.C. described the pain of his ears ringing after the explosion as a ten out of ten. He temporarily lost his

hearing, and his hearing was affected for at least two days. MPD Officer F.F. described ringing in his ears for nearly three hours after the explosion. MPD Officer C.T. described a continued ringing in his ears far into the next day.

For many other officers that were interviewed, it was the most memorable event that day. Some officers who were defending the tunnel at the time of the explosion reported feeling the pressure of the blast. Some thought it was a fragmentation grenade and anticipated pain or significant injury. Some thought they were going to die. Some officers suffered psychological trauma from the explosion.

Then, at approximately 4:49 p.m., BALL continued to throw objects into the tunnel. BALL armed himself with what appeared to be a wooden leg of a chair or table. BALL partially ascended the steps and forcefully threw the leg at the officers within the tunnel. The leg ricocheted off the top of the tunnel's arch, which was over the officers' heads. The leg struck a rioter in the face, knocking off his protective face mask. BALL's table-leg throw was captured—again—from multiple angles (*see figures 20 – 23*).



*Figure 20*



*Figure 21*



*Figure 22*



*Figure 23*

    At approximately 4:51 p.m. EST, BALL took a large, approximate six-foot-long pole from other rioters in the crowd behind him.  Within 10 seconds, BALL willingly passed the pole to an

unknown subject, who was closer to the front line of officers. Within another 20 seconds, that subject threw the pole like a spear at the officers at the front of the police line (*see Figure 24*).



*Figure 24*

## Laboratory

An Explosives and Hazardous Devices Examiner of the Explosives Unit at the Federal Bureau of Investigation Huntsville Laboratory examined photos and videos of the explosion in the tunnel on January 6, 2021. The Examiner was not able to conclusively identify the precise dimensions, charge size, or whether the explosive device thrown was improvised or commercially manufactured. However, based on his review of references to similar types of devices as the one observed, he concluded devices of this type are capable of inflicting damage to surrounding property as well as seriously injuring persons in the vicinity of the resultant explosion.

**Alleged Offenses**

Based on the foregoing, your affiant submits that there is probable cause to believe that DANIEL CHARLES BALL violated 18 U.S.C. § 111(a)(1) and (b), which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with any person designated in section 1114 of title 18 while engaged in or on account of the performance of official duties and using a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component). Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties.

Your affiant submits there is also probable cause to believe that DANIEL CHARLES BALL violated 18 U.S.C. § 844(h), which makes it unlawful to use fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or to carry an explosive during the commission of any felony which may be prosecuted in a court of the United States.

Additionally, your affiant submits there is also probable cause to believe that DANIEL CHARLES BALL violated 18 U.S.C. § 231(a)(3) and § 2, which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

Your affiant submits that there is also probable cause to believe that DANIEL CHARLES BALL violated 18 U.S.C. § 1752(a)(1), (2) and (4) and (b)(1)(A), which make it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempt or conspire to do so; and (b)(1)(A) during and in relation to the offense, use and carry a deadly and dangerous weapon.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant submits there is also probable cause to believe that DANIEL CHARLES BALL violated 40 U.S.C. § 5104(e)(2)(D), (F), and (G), which makes it a crime to willfully and

knowingly, (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Finally, your affiant submits there is probable cause to believe that DANIEL CHARLES BALL violated 18 U.S.C. § 641, which makes it a crime to steal, purloin, or knowingly convert to his use or the use of another, or without authority, convey or dispose of any thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been stolen, purloined or converted.

_____
Barry Kays
Task Force Officer
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 27th day of April 2023.

_____
G. MICHAEL HARVEY
U.S. MAGISTRATE JUDGE